and Consumer Protection, Inc. v. Alabama Department of Revenue, Inc. v. Alabama Department of Labor  Mr. Goodwin. Chief Judge Carnes, and may it please the Court, I'd like to reserve five minutes for my rebuttal. This case has now been to the United States Supreme Court twice in order to resolve a very critical issue of whether Alabama or any state can impose its general sales tax on diesel fuel used by railroads when it exempts its major competitors from that very same tax. And we know from CSXT, too, because it tells us that you, the Eleventh Circuit, got it right on two issues last time we were in this courtroom. Number one is that, and the Supreme Court has affirmed, that motor carriers and water carriers are the similarly situated members of this comparison class for this case. And secondly, this Court ruled, and the Supreme Court has now affirmed, that to impose the sales tax on railroad fuel and not on its competitors constitutes discrimination. It's facial discrimination. That's been established. This case is no longer about discrimination. But this case, and the burden has shifted now to the defendants, which is why they went first to trial. The burden has shifted to them to show justification. And that's what's left in the case. And the Supreme Court said so. The Supreme Court sent it back to this Court on just two issues. As to motor carriers, rather an alternative, roughly equivalent tax, and they're relying on the motor fuels tax, is a possible justification. And secondly, as to water carriers, where there is no tax-based justification, what other justifications can they establish? So this case is no longer about the discrimination, but the justification. I'd like to turn first to the water carriers. I'm sorry, to the motor carriers. The sole justification here is that Alabama has a motor fuels tax, and it's roughly equivalent to the Alabama sales tax imposed on railroad diesel fuel. But what do the courts say about how to judge that rough equivalent? They didn't send you out in a skiff in uncharted waters, because there's well-established precedent for decades in the Supreme Court and lower courts about what does a roughly equivalent tax mean. And they've used the compensatory tax doctrine. And how do we know that? How do we know the Supreme Court is incorporating the compensatory tax doctrine? It's not because they say they are. It's not because they say they are. It's not because they mentioned the word compensatory anywhere in the language. They did not. But Judge Carnes, here's what they did mention, very succinctly. They used to use one of their metaphors in the past. They haven't hidden, or I guess you would say they have hidden an elephant in the mouse hole. No, the elephant here is pretty obvious. It's in three parts. Number one, they said, look at our dormant Commerce Clause jurisprudence. Number two, they cite... They didn't say the test was the same. Well, they didn't need to, Your Honor, because the compensatory tax doctrine is so well-established. And they... No, I mean, they didn't say that the test is the same in the Four R's Act case as it is in the dormant Commerce Clause. Oh, that's correct, Your Honor. They didn't. They didn't. But the Supreme Court, I think, again, is not leaving you clueless on how to determine what the roughly equivalent tax is. And they did it not only by referencing the dormant Commerce Clause, and not only by citing Greg Dine Company, which the State concedes is one of the foundation cases for the compensatory tax doctrine, and they used the word roughly equivalent, which the Court often uses when they're talking about the compensatory tax doctrine. As a matter of fact, in the Winn case... Why didn't they just say, apply the compensatory tax doctrine? Well, because once they set the test, this is the way the Supreme Court operates. Once they set the test, they tell you how to determine roughly equivalent, but they leave it to the lower courts to do it. Okay? Well, that doesn't answer my question. Why didn't they say, apply the compensatory tax doctrine? I can't look into why their minds on why they didn't, but... Well, you're an advocate. Advocate the best imagination... And the best imagination is... I'm sorry. Yeah, go ahead. Did you finish your question? Sure. The way they did it doesn't require a lot of imagination, I hope, is that they said the dormant Commerce Clause, they said Greg Dine Company, and they said roughly equivalent. And to the Court and to the lower courts, that's the compensatory tax doctrine. I thought that Justice Scalia, not Kagan then first, but Justice Scalia said, look, if you pay the same amount of taxes, it would be crazy to say that that violates that, that discriminates, regardless of what you call the tax. That's true, isn't it? I don't think Justice Scalia said that. I think Justice Scalia said that. Well, he didn't say compensatory tax doctrine, and maybe he didn't say that. But you think that... Let's take it a step further. And I realize this is hypothetical. But suppose the motor carriers paid more tax under their different tax than the railroads did for diesel fuel. They paid more. Now, would there be a violation of the Four Hours Act? Well, yes, they would if... I'm sorry. That's not discrimination against the railroads. Well, Judge Carnes, I respectfully disagree, because you're only looking at the rate. You're not looking... No, I'm sorry. Suppose at the end of every year they've been taxed, every single year, you added up the total amount of tax. There's a computer over at the Department of Revenue that did that, let's say. And it showed that the railroads paid less tax than the motor carriers. Now, are you telling me that would still violate the Four Hours because it's a different name on the tax? No, it's not because it's a different name on the tax. As a matter of fact, we're trying to get away of the... Better yet, tell me, would that violate the Act? Yes, it would if the money is going to pay for the roads that the motor carriers use. That's a different issue. Suppose if all the money goes into the great void of the general fund, would the fact that the railroads paid less than the motor carriers not conclusively establish that there was no violation of the Act? Well, your Honor, if that is not the case, because it goes into the general fund, I submit that would be a total violation. All right, let's look at then... And we're really close to that, are we not, by the district court's fact findings of the seven-year period? We do not dispute the court's math, except for one part, and I do want to make this point early, because he did two calculations. First, as he had done in the first case, he included local sales taxes, which you have to include, because the cities impose this tax. I understand that. Okay, good. And when you do that, over this period of time, sometimes the sales tax was higher, sometimes it was lower. Now, I think he erred the second time by, I'm not going to look at local taxes, but I think that was just plain error. But the math he did is fine, as the judge... Judge, you contend, have you done the math, including state and local taxes? Is it in the record? Well, yes, it's in the record. We had an exhibit that included a lot of taxes. And it showed more of a disparity than the district. It did, it did. And where do we look in the record for that? Well, it's in the exhibit submitted by Ms. Friedman. Another thing the court did... Which is in the record on appeal. That is in the record. You didn't holler much about that in your brief. Well, because we don't think the case is about rate, with all due respect. Well, I think the case is about roughly equivalent taxation. And if the taxation revenue over a period of time is roughly equivalent, you lose. And under the district court's calculations in its opinion, it is roughly equivalent. It's less than one and a half percent difference. What is it, 57 times of the sub-periods, railroads were taxed more, and 57 times the motor carriers were taxed more. And that was based on the state's exhibit too, which was also erroneous because they didn't compare the entire local motor fuel tax to their calculation. I just didn't see that challenge. Counsel, so fundamentally, you don't challenge the numbers. Am I correct? Except for the fact about the local taxes. Right. That's correct. But as the justice said in Oregon Waste, just because the math is fine doesn't mean that you pass the test for rough equivalence. You have to look at more than the rate. And your position is that the Supreme Court implicitly signaled the rough equivalence analysis when it spoke in the two sentences to the negative commerce clause cases and the roughly equivalent law. That's correct, Judge Black. It's really that straightforward, isn't it? And it's not only us. Two of the leading state and local tax experts in the country, Professors Pomp and Hellerstein, both agree that the compensatory tax doctrine was incorporated here and it makes sense because, forget the labels for a second, just forget the labels. You have to look at what's going on in these two taxes. And it's more than trying to contrive equivalent rates because you're comparing a tax that's versus a tax that's imposed as per gallon. So all of this is contrived in that sense. I mean, the calculator works. You can pull out your calculator and confirm it. But there's more to it on roughly equivalent than just that rate. The district court in this case took evidence regarding the use of taxes. It did. And did the district, and I haven't read the whole record, but generally speaking with Professor Pomp and Dr. Mudge, it was primarily your evidence and the states presented not as much evidence as far as the use of the taxes. Am I generally correct? You're correct because our proof was basically undisputed and the district court in a footnote said I'm not looking at it. I'm not going to look at use of proceeds. So it's your position all of the evidence was presented to the district court. And ours was undisputed because it is undisputed. We know how the money is spent. The money that the motor carriers pay under the international fuel tax agreement goes to pay for their use of Alabama highways. I don't, I understand that, but I don't understand how we can justify your argument given the text, fashionable these days to actually look at what the statute says, the text of the statute. You got four subsections. Assess, which raises the tax. Levy or collect a tax, raises the tax. Levy or collect an amount that exceeds, raises the tax. Then number four, which is involved in this case. Impose another tax that discriminates against a rail carrier. It doesn't say impose another tax or appropriate revenue in a way that discriminates against a rail carrier. Judge Carnes, you're exactly right. It is an asymmetrical statute as Justice Kagan pointed out in CSX-T1. I think it's perfectly symmetrical in the sense that it's talking about discriminating in the amount of tax you collect. It says nothing, nothing at all about discriminating in the way you use that tax money. But it is a broad, as Justice Scalia points out in CSX-T2, it's a broadly written subdivision. He didn't say it's broadly written enough to get away from the text and he never would have. Impose another tax. Let me put it this way. If you have a tax on the rail carriers and it goes into the general fund or you have a tax on the rail carriers and it goes to take care of rail beds, then goodness knows the whole structure needs taken care of. And then the legislature says our schools are going to Hades. We need that money in the trust fund. And they amend that or appropriation bill, however they do it, and they say the tax on the rail carriers goes into the education trust fund. Now they haven't imposed another tax by that amendment. It's the same tax. So I don't see how you say if they have the same tax. Let's say they had the same sales tax for motor carriers that they had on rail carriers, verbatim, same provision. And one of them went to one purpose and another went to another purpose. I don't see how that's different taxes. That's different earmarking of the revenue raised by taxes. And Congress could have said that if they wanted to. But they didn't say it. That's the part of your argument I don't really understand. But we have to get into this now because as we argued in CSXT, too, and lost, is that you shouldn't be looking at these alternative taxes. It leaves you with a Sisyphean burden, as this Court said. And Justice Scalia didn't disagree. But now we're in that quicksand. No, you're looking at equivalent taxes, not equivalent revenue uses from the taxes. It's two different things. Well, Judge Korins, I respectfully disagree because roughly equivalent is more than what the rate is. No, roughly equivalent what? Not revenue scheme. Roughly equivalent tax, not roughly equivalent revenue enhancement and use. But the revenue is part of it, or the use is part of it, Judge Korins, as the Supreme Court said in Wesleyan Creamery. We can't close our eyes once you've got the tax and ignore how it's spent because that's part of the roughly equivalent analysis. You can't stop at, well, how much money is raised? It's not part of whether a tax is discriminatory. Well, it is under CSXT, too, Your Honor. I submit it is. Let me ask you this. Suppose there was no earmarking. Suppose everybody's tax went to the general fund. And suppose the legislature appropriates exactly the same amount for the motor carriers for the use of the highways that it would get if it earmarked it. Exactly the same amount. You can prove it. Everybody stipulates it. But they appropriate not one dime for the railroads. Does that violate Subsection 4? Yes, because again, the process... So now we're going in and examining the revenue appropriations of state legislatures and telling them how to do it? Judge Carrs, you don't need to do that for this case. I know it. That's why I gave you the hypothetical. This statute means that state legislatures have to appropriate the same amount measured by whatever ratio or revenue raising yardstick for railroads as for motor carriers and water carriers. Judge, the statute doesn't require that. What the statute requires, state, you make your policy decisions on how you're going to tax these three competitors. You make that decision. But, but what you do control is how the railroad is taxed. And when the state makes those policy decisions, they have to consider the fact, what's the effect on the railroad? I'm not talking about tax. Everybody's taxed the same. We've done an audit, let's say, for 10 years, and it comes down to one penny difference. And the railroads get the benefit of having one penny less. Everybody's happy about the tax. But the railroad says, you're not appropriating any money for me to take care of these railbeds, and I'm paying these tens of millions of dollars in taxes. And we're not asking them to appropriate money to our railroad bids. Well, your argument does. Your argument says you've got to earmark it. And if you've got to earmark it, you've got to appropriate it if there's no earmarks. Well, Your Honor, I didn't realize that was our argument because the court- Well, you're saying that what the tax is used for can discriminate and violate subsection 4. Because it's not a compensatory tax to the sales tax. The motor fuel tax is not a compensatory tax to the sales tax. Remember, we have a facially discriminatory tax. Okay. The only thing now is are they roughly equivalent, and they aren't. I got it. We'll give you five minutes, and we'll hear now from Mr. Mays. All right. May it please the Court, I'd like to start with what Judge Karnes was pointing out about the plain language of the statute. If you remember back to CSX 1, the court used Black's Law Dictionary to define what the word discriminates mean. Well, if you use the same dictionary to define the word tax, it simply says, a charge imposed by the government on persons, entities, transactions, or property to yield public revenue. That is a tax. That is different than a spending measure. Under the plain language of the statute, you do not impose spending measures. You impose taxes to raise revenues. The only thing that the court has asked this court to do is look at the tax, the actual money taken in. And that's exactly what Judge Kahlon did. He looked at the tax and determined that the trucks pay twice as much per gallon than the railroads do. Judge Karnes, the answer to your question is no. There is no evidence in the record on the total amount of revenue paid both by CSX and the trucks. We do know that CSX paid on average $2 million a year in state sales tax to the state by itself. If you add state and local, it's about $5 million a year. There's no record as to how much the trucks pay. I've seen the number. I can't give it to you. It's outside the record. Where did Judge Kahlon get those figures in his opinion? The tax rates. The tax rates we can give you because the trucks is a they pay a fixed federal rate of $0.244 per gallon. And depending on the jurisdiction, Birmingham for example, they pay a fixed rate per gallon. So unlike CSX where you actually have to do math because of the 4%, the trucks you can easily tell. Trucks in Alabama for the last 10 years on average have paid $0.19 per gallon to the state. But if you look at their total tax state plus local plus federal, they pay $0.474 per gallon. CSX over the same time period pays $23.4. That means that CSX already has a $0.24 per gallon advantage over the trucks. What CSX is trying to do is trying to get you to increase that advantage from $0.24 to $0.47 per gallon by literally paying $0. Judge Black, the answer to your question is yes, the state did put on evidence of the benefits that CSX receives and Judge Kahlon did find evidence of it. We don't believe that the benefits matters for the same reasons Judge Carnes was pointing out. But if you want to talk about the benefits, the court has found that CSX benefits from the sales tax it pays because it employs more than 1,200 Alabamians. It actively recruits in Alabama colleges like Auburn and pay. CSX, as its intermodal expert or its intermodal witness testified, the number one commodity in CSX nationally over the last five years is intermodal. That is when trucks and trains work together to ship on roads and railroad tracks. Counsel, as I understand the argument is that there was a lot of evidence presented regarding what the cost to the state was to when there are deaths. And all of that is in the record. But that was not considered by the district court. So it's in the record, but it was not considered by the district court. Is that fair? It's fair and not fair. And what I mean by that two-part answer is it was not considered by the court for the purposes of the truck comparison. Judge Kahlon rightly held that when you're looking at whether a tax is roughly equivalent, you look literally at the tax. Is the amount they pay, the revenue the state taking in roughly equivalent. So those numbers didn't matter. And that's not why the state brought those particular numbers. The reason this court, the last panel of this court sent the case back was for evidence on water carriers. That's what the court was concerned about because there was no evidence on water carriers. The point that the state was trying to make and did make according to Judge Kahlon with regard to the amount of money the state was spending is the state spent over $200 million in a three-year period dealing with issues caused by railroad crossings on state land. While at the same time, the state spent literally zero on interstate water carriers because they're on federal waters. So the evidence that we put on about the numbers wasn't going towards trucks necessarily because we don't believe those numbers matter. What we were doing was showing our justification that it is okay that the state allows the federal government to charge the water carriers $0.291 per gallon and we don't double tax them because we're not spending any money on the water carriers. They travel on federal waters and only the federal government exercises jurisdiction over them. That's where those numbers come from. Judge Karns, going back to your point about... Water carriers occasionally do have accidents, some of which are spectacular. As the Southern District of Alabama will tell you. If that's part of the justification for taxing the railroads and we say they get the benefit of the money we spend as a result of their accidents, why shouldn't we consider the occasional accidents of the water carriers? Two reasons for that. The first is the factual reason that in the last 10 years, commercial water carriers never actually had an accident in Alabama. The past how many years? Last 10. It's in the record. The last 10 years there has not been... In fact, it's in Judge Karns' factual findings. And I think my second answer actually... I can't recall when the barge hit the bridge in Mobile, but that was an incredibly expensive accident. And that's actually a good evidence of the second thing that I was going to bring up. The state has a memorandum of understanding with the federal government that if it is a commercial carrier who has the accident, then the federal government retains exclusive jurisdiction. The state stays out of it. If it's watercraft like boats, skis, jet skis, et cetera, recreational, then the state comes in. But in that instance, in an instance where it's a commercial water carrier, the state, by understanding a signed agreement with the federal government, we're hands off. That's our point about commercial water carriers. Not only has it hasn't happened in the last 10 years, if it did happen, and Judge Kahlon found this in his fact findings, the states would stay out of it. Moving back to your point about the Judge Justice Scalia's opinion, the actual quote that you're referring to is his hypothetical saying that if the trucks paid a four, if CSX were to pay a 4% sales tax in subpart one, in subpart two, all others pay a 4% sales tax, that's not discriminatory. And again, that shows you the mindset of the court on what they believed the test here should be. Are you saying that state and local or just state? Just state. We win either way, but it should just be state because again, the plain language of the statute says the state shall not, quote, impose a tax. Yeah, but county and city, as anybody who ever looked at the Alabama Constitution or skimmed it, knows are part of the state. I mean, they're creatures of the state. There's very little local control other than the GBLAs. And I don't see how you can separate county and city from the state for this purpose. I understand the point. I would say that because the Supreme Court has read the plain language of this statute every single time they've had it, that it is best to err on the side of plain language. If you look back at CSX2, when Justice Scalia was writing for the majority in the statement of facts, he says it is a 4% sales tax, not a 10% state plus local sales tax. Well, if you do that, it seems like we have an opinion that says that this is a very difficult burden for the lower courts to do to figure out this roughly equivalent number. And if the inquiry is just looking at the two tax rates and saying one is bigger than the other and not even looking at the local tax rate, that seems to me a very easy task. And what is the difficult task that they are referring to if it's just look at two numbers and decide which one is bigger? Respectfully, Justice Scalia was being sarcastic. The word Sisyphean came from this court, the previous panel, and frankly, he was being sarcastic. He was saying it's not that hard. 23 cents per gallon, 23.4 cents per gallon or 19 cents per gallon versus 9 cents a gallon. Any district court, any circuit court can do that. So I think that's the answer to your question. There's not a hard thing to do here. That's why Justice Scalia gave the hypothetical he did and said, well, if you're both 4%, the case is over. My opposing counsel brought up the fact that two experts in this case have said that the entire compensatory tax doctrine should be applied. Respectfully to both of the professors, both have been retained by CSX or their counterparts in this case. I know Professor Hellerstein has written three amicus briefs on CSX's behalf, and Professor Pomp was retained to testify at trial. If you look at the persons and entities that have not been retained by either party, you have the Sixth Circuit, the Ninth Circuit, and the Tennessee District Court, the United States Solicitor General, all have come out on the same side saying that you don't look at where the state spends the money. We believe that all of them are correct. We don't believe that there has any reason for this court to create a circuit split to send this case back to the Supreme Court for a third time. The Supreme Court made it very clear that it didn't want that, and we believe that if this court follows every other court that's decided this issue so far, that can be avoided. With the remainder of my time, I would like to that in the two amicus briefs in the U.S. Supreme Court and CSX 2, the two that are in front of the court now on behalf of CSX, and the first 18 minutes of CSX's argument today, they haven't said one word about water carriers. And there's a reason for that. The reason is, is the water carriers are so minimal. In fact, as Judge Kahlon found, they provide literally no injury because there's no instance where they compete and one pays the tax and one doesn't, that they really don't matter in this case. It's very telling that Chief Justice Roberts' very first question to the state, or to CSX, was can't we get rid of this case because they're less than one percent, and his only question on rebuttal to the state was, can you give me something on water carriers? It's something that always should have gone away, and I can give you numbers that show why. If you look at the amount by tonnage of interstate commerce in the state, first things that come out plus things that go in, for every one ton that the water carriers do, three tons for trains, eight tons for trucks. If you only look at the numbers of tonnage that leave the state, that start here and go out, and that's where the tax would be paid because the diesel fuel is being bought here, for every one ton of water carrier traffic, six tons for the trains, 22 and a half for the trucks. This case is and always has been about trucks versus trains. That doesn't sound de minimis to me, and I'm not sure I buy your de minimis argument. Okay. Because suppose there's a clearly discriminatory tax, and suppose they both cause the same amount of damage, or both we have to pay the same amount because of their existence, and we tax the dickens out of the railroads and give water carriers a free ride. You say, well, not worth fooling with. Eight to three? It doesn't sound de minimis to me. Respectfully, I may not have should have started there. We didn't win on de minimis. I know, but you're arguing it now. I'm only making the point that CSX has never really argued water carriers, and there's a reason, but I will spend the rest of my time arguing the things we actually won on. They're that issue in their briefs. They did. So they've argued it. We understood. So it's not true. They've never argued it. I will retract what I've said and move on to what I should have started with, and that is the fact that they've never proved an injury, and the fact is that whether it's de minimis or not, throughout two trials, never once has... I don't understand the concept of energy, injury, or energy for that matter. It says you can't impose a discriminatory tax. It doesn't say you can't impose a discriminatory tax that injures the railroads. Respectfully, federal courts don't have the jurisdiction to enjoin a state tax unless there is an injury, in fact. You have to have Article III standing. There has to be a case or controversy with injury, and respectfully... The injury is they have a higher tax than under the act they should have, and if you apply the exemption to them that the water carriers have, they will pay no tax. That is millions of dollars of injury that you're seeking to have redressed. Respectfully, that's the same injury that every single person in this room has. Whoever bought those water bottles paid the same 4% sales tax. That's a general tax... But we don't have any claim under the Railroad Act. No, and that's why we brought up Spokio... But we don't have any standing under the Railroad Act because there's no culpable claim at all, but the railroads do have it. They do. They have statutory standing. They can bring a claim, but they still have to show that they're somehow injured. That's why we... And wasn't that decided in these other cases when there was determination that these water carriers were competitors of the railroads? And isn't that something that has been discarded by one of these other cases that have dealt with? Isn't the case really limited to these issues that we're dealing with in terms of the discrimination of the tax, not the injury any longer? Respectfully, I don't think you can ever end a case without determining whether or not a plaintiff is injured. But isn't that already been determined? I guess that's what I would say. It has never been determined. It was ruled by Judge Kahlon in the first trial. It came up to this court in the last instance. This court was very... I'm trying to think of the right word. Frustrated that there were no facts and evidence last time proving it either way. When the case came back from CSX2 and the Supreme Court said, we want you to look at the state's arguments, sua sponte, the previous panel said, tell us whether or not we should have a trial or tell us whether or not we should send this back to Judge Kahlon for fact findings on water carriers. This court specifically said water carriers. So that's what we went back and did. And we put in the factual findings that would prove the state was both justified and even if we weren't, there was no injury. So injury has always been an issue in this case. It is something that... Need to get to the justifications, I think. I will. We have two justifications, one of which the court agreed with and one of which it didn't. I'll start with the one it agreed with. And one about both of these exemptions. This is not an instance where the state chose to discriminate in favor of trucks and boats against CSX. Both of these exemptions started because the federal government told us we had to. On the truck side, they said you will not get federal revenues for highway spending unless you dedicate your own state taxes for highway funds. On the boat side, Supreme Court said you cannot tax boats that go across state lines on the rivers under the Commerce Clause. That's where it started. Ever since, we have maintained that, as have apparently 40 other states. And we are justified in not taking the affirmative action of getting rid of that exemption because if and when we do, we have a threat of being sued, just like CSX sued us here under their statute. We have a threat of being sued by interstate water carriers under the Commerce Clause and the Maritime Security Act. Well, the threat of being sued by CSX obviously did not persuade you to extend the exemption to them. No. So why extend it to the water carriers? It is a choice that the state has the ability to make. It is an exemption we've always had. It was forced upon us initially by Congress in the Enabling Act in the Supreme Court. And the state has the ability to decide we don't think it is something in our best interest to try to get this minimal amount of money we might get if we do this just to avoid litigation against trains. It's a decision that we have made. So the reward is larger from taxing the railroads justifies the same amount of risk. Again, we have always taxed CSX. This statute has been in effect for 80 years. They just waited 70 years to sue us. It's not like we made a decision one day and just said, let's go tax CSX. They waited how many years? Well, the tax has been in effect since in the 1930s. So they really waited since the 4R Act went into effect in the 60s or 70s. That's the real measure. That's the real measure. But even under that measure, we're talking 30 to 40 years. I mean, under CSX's theory, we've been discriminating for three to four decades, but they waited that long for we don't know what reason. So your defense is repose, latches? No, I will take that as a defense, but that's not how we're articulating it. We are wondering what relevance it had to our present discussion. I apologize. I was simply answering the court's question. You got a minute 38 left. I want to ask a question about the part where you're saying it's compelled by federal law because there's this threat out there that you could get sued by the water carriers. And what I'm kind of trying to understand is how strong is the standard? So you're basically asking this court to find, in some respects, that by imposing this tax against water carriers, it would violate the commerce clause. And then these 10 other states that are doing this would be doing something unconstitutional. But the term you're using is compelled. So how strong does finding have to be that this is unconstitutional to provide an excuse for you not to go in another direction? I think that all we have to show is the fact that they have a reasonably articulable claim, a claim that could win. And we've shown that by the fact that Illinois did this and lost their tax. Where does that come from, that it only has to be a reasonably articulate claim that there is this violation of the commerce clause? That's the piece that I ever said is it has to be a sufficient justification. And they said one of the justifications is that you were required by federal law. And again, I've only got 30 seconds left. That's only one of two reasons. And our primary argument has always been the state can choose not to double tax water carriers. Water carriers already pay a greater amount of federal tax than CSX does, state plus local combined. We can choose not to make them pay an additional amount on top of that when we're not spending a dime on them. But don't motor carriers pay federal tax too? They do. Okay. So they and water carriers are similarly situated. They both pay federal tax. I would disagree with that for the same reason I would disagree with the trains. The motor carriers travel across state lands. We deal probably every five minutes with motor carrier accidents. If you live in Montgomery and have the WSFA app. That's a different thing from whether they're federally taxed. And the railroads are federally taxed as well, aren't they? No, they're not. Not a penny? Not a penny. Direct or indirect? Not direct or indirect. If you get rid of this tax, CSX will literally be tax free. What the injunction would do, I suspect, is not necessarily get rid of this tax. It would get rid of the exemptions, for example, on the motor carrier. I think the state would have to choose or would be allowed to choose. I think if you rule in water carriers, they would be allowed the exemption if they crossed state lines. But again, that's something that would require a remand simply because the court hasn't looked at it yet. But I don't think that's necessary because I think there are multiple reasons in this instance why the water carriers who haven't been injured, we are justified in not taxing them. All right. Thank you. Let's hear from Mr. Goodwin. Judge May, I want to get to your point about being compelled, but I've got to start off by saying we need to debunk this theory that the railroads don't pay taxes in Alabama. They pay millions of dollars of taxes in Alabama and not just CSX. There are two other major railroads, BNSF Railway and Norfolk Southern, and they're paying sales tax on all their materials. Like any other taxpayer, when their vehicles use the roads, as they do, they pay the motor fuel tax. They pay millions of dollars in property tax. They are paying their fair share. We need to get away from this concept that the railroads are trying to escape paying taxes. Are they paying any federal taxes? Well, they pay income taxes. They pay... Is there a federal motor fuel tax on railroads? No, because the federal government distinguishes between on-road and off-road, and the railroads are using their fuel off-road, so it is not subject to the motor fuel tax. But if I may, let me get my word in edgewise about water carriers. The judge leaps from exposure to suit to federal compulsion, and that's an unjustified leap, and that could not be what CSXT was talking about. What the judge relied on, and Mr. Mays is correct, he rejected correctly two things they relied on. One was the Maritime Transportation Security Act, which Judge Kalan Kerepke said doesn't apply. They relied on an argument they have not resuscitated here, which was when Alabama joined the union, they promised they wouldn't tax water carriers. He threw that one out too. What he came down on was the Commerce Clause question. It is ludicrous to argue in the 21st century that a state may not apply a properly apportioned sales tax on the fuel of water carriers, and we know that several states do, and they can do that because of complete auto transit, which has said you can impose a tax, and this is a case decided 50 years after the Helsin case, which is the case Mr. Mays was referring to about you can't tax interstate commerce. We know you can, and it is specious to argue, number one, that that would even be a culpable claim, but even if it is, why is that an excuse to discriminate against railroads? It's a non sequitur. Quickly, let me talk about benefits. The judge himself, this is one of the issues we won. Judge Kahlon said, look, these benefits are not calibrated to the sales tax. Alabama didn't sit down and say, well, railroads are going to pay a 4% sales tax to pay for their burdens, and Judge Kahlon was right. You don't do that, and also, Judge Karnage, you're right. The law is we don't prove injury in a case like this. Congress has if it violates the act, it will be enjoined. That's what Congress has said. Congress has made that determination, and as to the motor carriers, to show how these taxes are different, recall, and it's in our brief, in the brief of the amicus, other states impose a sales tax on both, which they can do. Motor carriers, I'm sorry, both taxes on motor carriers, which they can do because they're taxing different things. Illinois says, motor carriers, you will pay a sales tax like everybody else in the state when you engage in the transaction of buying fuel, and you'll also pay a motor fuel tax, and why? Because it's going somewhere differently. It's going to pay for the roads. It is a different purpose. These are not mutually exclusive taxes, which you have to have under any, forget compensatory tax doctrine if you want to, under any analysis. They have to be mutually exclusive to be compensatory. They have to be like the sales and the use tax. Compensatory taxes, mutually exclusive. I also want to talk briefly about the split that Mr. May says you may be getting into here. You won't be getting into a split here. The Ninth Circuit case has been totally abrogated. They had two rulings in that case. Number one was you don't state a claim under this subsection for exemption. Wrong. CSX1 tells us that. Their second ruling, you got to use the comparison class of other commercial industrial property. Wrong. The CSXT2 tells us that. There's no split if you look at the proceeds in this case with the Sixth Circuit because that equivalent case. In their view, they were looking at a single tax. They didn't need to get into roughly equivalent. In any way, they don't cite any authority for the fact that you don't look at how you use the proceeds because Westland Creamery says that you do. I'll say my time has expired unless the Court has any further questions. We don't. Thank you. That was well argued by both sides. We'll take that case under submission and we're going to have a 10-minute recess now before we take up Kaiser.